## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KAPIL PURI, derivatively on behalf of EXICURE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DAVID A. GILJOHANN, BRIAN C. BOCK, JEFFREY L. CLELAND, ELIZABETH GAROFALO, BOSUN HAU, BALI MURALIDHAR, ANDREW SASSINE, MATTHIAS SCHROFF, JAMES SULAT, and TIMOTHY P. WALBERT, <br><br> Defendants, <br><br> and <br><br> EXICURE, INC., <br><br> Nominal Defendant. | Case No.: 1:22-cv-01083 <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Kapil Puri ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Exicure, Inc. ("Exicure" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants David A. Giljohann ("Giljohann"), Brian C. Bock ("Bock"), Jeffrey L. Cleland ("Cleland"), Elizabeth Garofalo ("Garofalo"), Bosun Hau ("Hau"), Bali Muralidhar ("Muralidhar"), Andrew Sassine ("Sassine"), Matthias Schroff ("Schroff"), James Sulat ("Sulat"), and Timothy P. Walbert ("Walbert")

1

(collectively, the "Individual Defendants," and together with Exicure, the "Defendants") for breaches of their fiduciary duties as current and former directors and/or officers of Exicure, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Giljohann, Cleland, Garofalo, Hau, Muralidhar, Sassine, Sulat, and Walbert for violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Giljohann and Bock for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff's and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Exicure, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Exicure's current and former directors and/or officers from January 7, 2021 through December 10, 2021, both dates inclusive (the "Relevant Period").

2.     According to its annual report filed with the SEC on Form 10-K on March 11, 2021 (the "2020 10-K"), Exicure is "a clinical-stage biotechnology company developing therapeutics for immuno-oncology, genetic disorders and other indications based on our proprietary Spherical Nucleic Acid, or SNA, technology. SNAs are nanoscale constructs consisting of densely packed

2

synthetic nucleic acid sequences that are radially arranged in three dimensions."

3.　　　One such SNA therapeutic that Exicure was working on prior to and during the Relevant Period was called "XCUR-FXN." XCUR-FXN was intended to treat Friedreich's ataxia, a genetic neurological disorder that over time causes patients to lose control over various muscle movements and usually results in a patient's early death.

4.　　　Throughout the Relevant Period, the Individual Defendants caused the Company to maintain inadequate internal controls over the data generated by its preclinical development program for XCUR-FXN. Resultingly, improprieties were present in the Company's preclinical program and Exicure misreported data about the efficacy of XCUR-FXN in public presentations and SEC filings between January 7, 2021 and August 12, 2021, at least. As a result, the investing public was under the mistaken belief that XCUR-FXN was a more viable product candidate than it actually was.

5.　　　The truth began emerging on November 15, 2021, after the market had closed, when the Company filed a Form 12b-25 with the SEC, informing the SEC that Exicure would not be able to timely file its quarterly report for the quarter ended September 30, 2021. The Form 12b-25 attributed this failure to the Company's recently commenced investigation into "a claim made by a former Company senior researcher regarding alleged improprieties that researcher claims to have committed with respect to the Company's XCUR-FXN preclinical program for the treatment of Friedreich's ataxia."

6.　　　On this news, the price of the Company's common stock fell from $1.070 per share at the close of trading on November 15, 2021, to close November 16, 2021 at $0.777 per share. This constituted a decline of $0.293 or over 27.3%.

7.    The truth continued emerging on November 19, 2021, before the market opened, when the Company issued a press release revealing that its Audit Committee had retained outside counsel to investigate the claims made about XCUR-FXN by the former Company senior researcher.

8.    On this news, the price of the Company's common stock fell from $0.658 per share at the close of trading on November 18, 2021, to close November 19, 2021 at $0.460 per share. This constituted a decline of $0.198 or over 30%.

9.    The truth then fully emerged on December 10, 2021, after the market had closed, when the Company issued a press release revealing the results of the Audit Committee's investigation. Specifically, the investigation found, *inter alia*, that due to improprieties in the testing of XCUR-FXN, "misreported data was included in various public presentations and SEC filings from as early as January 7, 2021 through as late as August 12, 2021[.]" The Company also announced in this press release that Exicure would be reducing its workforce by approximately 50%, was indefinitely suspending development of XCUR-FXN, and was engaging in a "[r]estructuring and realignment of the Company's executive team[,]" which included, Defendant Giljohann stepping down as Chief Executive Officer ("CEO"), Defendant Bock being promoted from Chief Financial Officer ("CFO") to CEO, Defendant Schroff transitioning from Chief Operating Officer ("COO") to Chief Scientific Officer ("CSO"), and nonparty Douglas Feltner departing as the Company's Chief Medical Officer. In addition, this press release announced that the Company's Vice President of Human Resources was being promoted to Chief Human Resources Officer and Chief Compliance Officer. Finally, the press release revealed that this executive team restructure was projected to cost $1.2 million.

10.    On this news, the price of the Company's common stock fell from $0.455 per share

at the close of trading on Friday, December 10, 2021, to close Monday, December 13, 2021—the next trading day—at $0.270 per share. This constituted a decline of $0.185 or over 40%.

11. During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls with respect to ensuring the proper collection, analysis, and reporting of the data generated by its studies. Moreover, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls with respect to ensuring the accuracy of public disclosures, including investor presentations and SEC filings (this misconduct collectively, the "Deficient Controls Misconduct").

12. During the Relevant Period, the Individual Defendants further breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company was engaged Deficient Controls Misconduct; (2) there were improprieties in the testing of XCUR-FXN; (3) due to the Deficient Controls Misconduct and the improprieties in the testing of XCUR-FXN, the Company misreported data about the efficacy of XCUR-FXN; and (4) therefore, XCUR-FXN was not as promising a product candidate as the Company represented and its development would need to be suspended. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13. Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering

them personally liable to the Company for breaching their fiduciary duties.

14.     In light of the Individual Defendants' misconduct, which has subjected Exicure, its former CEO, and its former CFO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Securities Class Action"), and further subjected the Company to the need to undertake internal investigations, the need to remedy the Deficient Controls Misconduct, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, including the Company's current directors; their collective engagement in fraud; the substantial likelihood of the directors' liability in this derivative action; their being beholden to each other; their longstanding business and personal relationships with each other; and their not being disinterested and/or independent directors, a majority of Exicure's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1); Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

17.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or they are an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. Moreover, Exicure maintains its principal executive offices in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Exicure common stock. Plaintiff has continuously held Exicure common stock at all relevant times.

### Nominal Defendant Exicure

23.     Exicure is a Delaware corporation with its principal executive offices at 520 Lake Cook Road, Suite 315, Deerfield, Illinois 60015. Exicure's shares trade on the NASDAQ under the ticker symbol "XCUR."

### Defendant Giljohann

24.     Defendant Giljohann served as the Company's CEO from November 2013, and as a Company director from March 2014, until December 2021, when he transitioned to Chief Technology Officer. He completely left Exicure in January 2022. He was the Company's founding scientist in 2011, served as principal scientist from 2011 until June 2012, and served as COO from

July 2012 until October 2013. Moreover, from September 2020 until May 2021, he was the Company's interim CFO. According to the proxy statement that the Company filed with the SEC on April 22, 2021 (the "2021 Proxy Statement"), Defendant Giljohann beneficially owned 2,129,051 shares of Exicure common stock as of March 31, 2021, or 2.4% of the Company's outstanding common stock at that time. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $2.18, Defendant Giljohann owned approximately $4.6 million worth of Exicure stock.

25.     Pursuant to the separation and transition agreement that Defendant Giljohann entered into with the Company in connection with his departure, he is entitled to a severance payment of $550,000. According to the 2021 Proxy Statement, for the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Giljohann was entitled to a base salary of $550,000 in addition to being eligible for option awards, non-equity incentive plan compensation, and other compensation.

26.     The 2021 Proxy Statement stated the following about Defendant Giljohann:

*David A. Giljohann, Ph.D.* has served as our Chief Executive Officer since November 2013 and as a member of our Board of Directors since March 2014. Dr. Giljohann was our founding scientist in 2011, served as our principal scientist from 2011 until June 2012, and served as our Chief Operating Officer from July 2012 to October 2013. Prior to joining us, Dr. Giljohann was the founding scientist of AuraSense, LLC, our largest stockholder, in 2009. Dr. Giljohann completed his Ph.D. in the laboratory of Dr. Mirkin where he developed oligonucleotide-modified nanoparticles, including NanoFlare™ and Spherical Nucleic Acid (SNA™) technologies. Dr. Giljohann was named to the Endpoint News' "Under 40s" biopharma executives list in 2018 and the Analytical Scientist's "Top 40 Under 40 Power List" in 2014. Dr. Giljohann has also been recognized for his work with a Materials Research Society Gold Award, Baxter Innovation Award, Rappaport Award for Research Excellence, NSEC Outstanding Research Award, and as a finalist in the National Inventors Hall of Fame Collegiate Inventors Competition. Dr. Giljohann received his B.A. in Biology and Ph.D. in Biochemistry from Northwestern University. Our Board believes that Dr. Giljohann's experience in biotechnology research and development qualify him to serve on the Board.

**Defendant Bock**

27.     Defendant Bock served as the Company's CFO from May 2021 until December 2021 and as CEO and a director from December 2021 until February 2022, when he left the Company.

28.     For 2021 Fiscal Year, Defendant Bock's annual salary was initially $405,000 when he joined the Company in May 2021. This was raised to $525,000 when he was promoted to CEO on December 10, 2021. During the 2021 Fiscal Year, he was also eligible for option awards, non-equity incentive plan compensation, and other compensation. Moreover, Defendant Bock received a $60,000 sign-on bonus and an option to purchase 600,000 shares of Company common stock at $1.54 per share in connection with his joining the Company in May 2021. In connection with his promotion to CEO, Defendant Bock received an additional retention bonus of $180,000. Finally, in connection with his departure from the Company in February 2022, Defendant Bock is entitled to $25,000 per month for his services as Special Advisor to the CEO, which arrangement will last for a minimum of three months.

29.     The Form 8-K announcing that Defendant Bock was joining the Company, which the Company filed with the SEC on May 13, 2021, said the following of Defendant Bock:

> Prior to joining the Company, Mr. Bock, 45, served as a Managing Director of Healthcare Investment Banking at Lincoln International LLC from January 2018 to May 2021. Prior to that, Mr. Bock was a member of the Healthcare Investment Banking team at JMP Securities LLC from May 2005 through January 2018, most recently serving as a Managing Director. He was also a member of the Healthcare Investment Banking team at RBC Capital Markets, LLC from August 2002 to May 2005. Mr. Bock earned his B.S. in Finance from Northern Arizona University.

**Defendant Cleland**

30.     Defendant Cleland has served as a Company director since July 2019. He also serves as Chairperson of the Compensation Committee and as a member of the Nominating and

Corporate Governance Committee. According to the 2021 Proxy Statement, Defendant Cleland beneficially owned 46,398 shares of Exicure common stock as of March 31, 2021. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $2.18, Defendant Cleland owned approximately $101,000 worth of Exicure stock.

31.     According to the 2021 Proxy Statement, for the 2021 Fiscal Year, Defendant Cleland was entitled to a $40,000 cash retainer as a director, an additional $5,000 in cash as a member of the Compensation Committee,[1] and additional compensation in the form of option awards.

32.     The 2021 Proxy Statement stated the following about Defendant Cleland:

*Jeffrey L. Cleland, Ph.D.* has served as a member of our Board of Directors since July 2019. Dr. Cleland is the co-founder, chairman, chief executive officer and president of Ashvattha Therapeutics, Inc., and co-founder and executive chairman of Orpheris, Inc., a wholly owned subsidiary of Ashvattha, a position he has held since July 2015. He currently serves as a director of ImmunSys, Inc., and Zylem, Inc. He previously served as the chief executive officer, president and director of Graybug Vision, Inc. from May 2016 to September 2018, and as interim chief executive officer of GrayBug, Inc. from May 2015 to May 2016. Dr. Cleland co-founded Versartis, Inc. in 2008 and served as its chief executive officer and president from May 2009 to May 2015. Dr. Cleland also founded and served as a chief executive officer and director for Diartis Pharmaceuticals, Inc. from December 2010 to March 2013. Dr. Cleland also acted as an adjunct assistant professor at University of the Pacific, University of Kansas and University of Colorado. He holds a B.S. in Chemical Engineering from the University of California, Davis and a Ph.D. in Chemical Engineering from the Massachusetts Institute of Technology. Our Board believes that Dr. Cleland's experience in drug development and as a director and executive at various biopharmaceutical companies qualify him to serve on the Board.

**Defendant Garofalo**

33.     Defendant Garofalo has served as a Company director since March 2021 and has

---

[1] Defendant Cleland served as a member of the Compensation Committee during the 2021 Fiscal Year, before being made Chairperson of the Compensation Committee and a member of the Nominating and Corporate Governance Committee in February 2022.

served as Chairperson of the Board since February 2022. She also serves as a member of both the Audit Committee and the Compensation Committee. According to the 2021 Proxy Statement, Defendant Garofalo beneficially owned 5,555 shares of Exicure common stock as of March 31, 2021. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $2.18, Defendant Garofalo owned approximately $12,000 worth of Exicure stock.

34.    According to the 2021 Proxy Statement, for the 2021 Fiscal Year, Defendant Garofalo was entitled to a $40,000 cash retainer as a director, an additional $7,500 in cash as a member of the Audit Committee,[2] and additional compensation in the form of option awards.

35.    The 2021 Proxy Statement stated the following about Defendant Garofalo:

*Elizabeth Garofalo, M.D.* has served as a member of our Board of Directors since March 2021. Dr. Garofalo has served as the Principal for EAG Pharma Consulting LLC since April 2016. She has also served on the board of directors of Acadia Pharmaceuticals, Inc. since September 2020. Prior to 2016, Dr. Garofalo served in numerous leadership roles including as Senior Vice President and Co-Head of the Novartis Neuroscience Franchise between 2010 and 2013, Senior Vice President and Global Head of Clinical Development between 2013 and 2016, member of the Novartis Global Development Leadership Team from 2010 until 2016. She was Chair of the Novartis Portfolio Stewardship Board from 2013 until 2015. She also served as Vice President and Head of the Neuroscience Therapy Area at Astellas from 2009 to 2010. Dr. Garofalo currently serves on the board for the Institute for Advanced Clinical Trials in Children and is the Chair of the Business Advisory Board for the Epilepsy Foundation of America. She earned her M.D. from the Indiana University School of Medicine where she completed her Pediatric Residency. She completed fellowships in Pediatric Neurology and Epilepsy at the University of Michigan Medical School. Our Board believes that Dr. Garofalo's experience in biotechnology and pharmaceutical industries qualify her to serve on the Board.

**Defendant Hau**

36.    Defendant Hau served as a Company director from August 2019 until February

---

[2] Defendant Garofalo served as a member of the Audit Committee during the 2021 Fiscal Year, before also being made a member of the Compensation Committee in February 2022.

2022. At the time of his resignation, he also served as Chairperson of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, Defendant Hau beneficially owned 45,193 shares of Exicure common stock as of March 31, 2021. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $2.18, Defendant Hau owned approximately $99,000 worth of Exicure stock.

37.     According to the 2021 Proxy Statement, for the 2021 Fiscal Year, Defendant Hau was entitled to a $40,000 cash retainer as a director, $12,000 in cash as Chairperson of the Compensation Committee, an additional $5,000 as a member of the Nominating and Corporate Governance Committee, and additional compensation in the form of option awards.

38.     The 2021 Proxy Statement stated the following about Defendant Hau:

*Bosun Hau* has served as a member of our Board of Directors since August 2019. Since April 2019, he has served as a Managing Director and Co-Head of Private Investments at Tybourne Capital Management (HK) LTD., a Hong Kong based global public and private equity investment management firm. From October 2015 to April 2019, Mr. Hau served as a Managing Director and Partner at Sailing Capital (HK) LTD., a Hong Kong and Shanghai based global private equity firm. From August 2009 to October 2015, Mr. Hau served as a Partner of MVM Partners LLP, a Boston and London based healthcare investment firm. From 2008 to 2009, Mr. Hau served as a management consultant with McKinsey & Company LP in Southeast Asia and as an early stage biotechnology investor with S.R. One Ltd, GlaxoSmithKline's corporate venture group. From July 2004 to August 2007, Mr. Hau served as an equity research analyst covering the medical device and pharmaceutical industries for JP Morgan Securities, Inc. and Prudential Securities, Inc. Mr. Hau started his career in sales and marketing at Eli Lilly & Company. Mr. Hau also served on the board of directors of Bicycle Therapeutics plc and is a board overseer of Beth Israel Deaconess Medical Center in Boston, a major teaching hospital of Harvard Medical School. Mr. Hau served as a director of Evolus, Inc., from February 2018 until April 2020, and of Cellular Biomedicine Group, Inc., from February 2018 until May 2019. Mr. Hau received a B.S. in Molecular and Cellular Biology, a B.S.H.S. in Physiological Sciences and a B.A. in Psychology from the University of Arizona, an M.Sc. in Biotechnology from Johns Hopkins University and an M.B.A. in Finance and Health Management from the Wharton School at the University of Pennsylvania. Our Board believes that Mr. Hau's experience in corporate management as well as his experience as an early stage

12

biotechnology investor qualify him to serve on the Board.

**Defendant Muralidhar**

39.     Defendant Muralidhar has served as a Company director since August 2019. He also serves as Chairperson of the Nominating and Corporate Governance Committee and as a member of both the Audit Committee and the Compensation Committee. According to the 2021 Proxy Statement, Defendant Muralidhar beneficially owned 7,022,193 shares of Exicure common stock as of March 31, 2021, representing 8.0% of the Company's outstanding common stock at that time. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $2.18, Defendant Muralidhar owned approximately $15.3 million worth of Exicure stock.

40.     According to the 2021 Proxy Statement, for the 2021 Fiscal Year, Defendant Muralidhar was entitled to a $40,000 cash retainer as a director, $8,000 in cash as Chairperson of the Nominating and Corporate Governance Committee, an additional $5,000 as a member of the Compensation Committee,[3] and additional compensation in the form of option awards.

41.     The 2021 Proxy Statement stated the following about Defendant Muralidhar:

*Bali Muralidhar, M.D., Ph.D.* has served as a member of our Board of Directors since August 2019. Dr. Muralidhar has served as partner at Abingworth LLP, an international investment group dedicated to life sciences, since March 2019. Prior to joining Abingworth, Dr. Muralidhar was a senior partner at MVM Partners LLP from November 2012 to March 2019. Prior to MVM, he was a member of Bain Capital LP's leverage buyout team, focusing on healthcare from April 2011 to November 2012. Dr. Muralidhar currently serves on the board of directors of Spruce Biosciences, Inc. a biotechnology company traded on the Nasdaq Global Select Market and NuCana PLC, a biotechnology company traded on the Nasdaq Stock Market. He previously served on the supervisory board of Valneva SE, a French biotechnology company traded on the Vienna Stock Exchange and on the board of directors of Wilson Therapeutics AB, a Swedish biopharmaceutical

---

[3] Defendant Muralidhar served as Chairperson of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee during the 2021 Fiscal Year, before also being made a member of the Audit Committee in February 2022.

company traded on the Nasdaq Stockholm. Dr. Muralidhar earned a degree in clinical medicine from the University of Oxford and has a Ph.D. in translational cancer research from the MRC Cancer Cell Unit, University of Cambridge. Our Board believes that Dr. Muralidhar's experience working with and investing in companies in the life sciences industry qualifies him to serve on the Board.

**Defendant Sassine**

42.     Defendant Sassine served as a Company director from March 2021 until February 2022. At the time of his resignation, he served as a member of the Audit Committee. According to the 2021 Proxy Statement, Defendant Sassine beneficially owned 205,555 shares of Exicure common stock as of March 31, 2021. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $2.18, Defendant Sassine owned approximately $448,000 worth of Exicure stock.

43.     According to the 2021 Proxy Statement, for the 2021 Fiscal Year, Defendant Sassine was entitled to a $40,000 cash retainer as a director, an additional $7,500 as a member of the Audit Committee, and additional compensation in the form of option awards.

44.     The 2021 Proxy Statement stated the following about Defendant Sassine:

*Andrew Sassine* has served as a member of our Board of Directors since March 2021. Mr. Sassine has served as the Chief Financial Officer at Arcturus Therapeutics since January 2019 and on the board of directors of Arcturus Therapeutics since May 2018. He has also served on the board of directors of ICAD Inc. since December 2015. Prior to that, Mr. Sassine served in various positions at Fidelity Investments from 1999 to 2012, including, most recently as Portfolio Manager. Between 2005 and 2011, he managed the Fidelity Small Cap Stock Fund, the Fidelity International Small Cap Opportunities Fund and the Fidelity Advisor International Small Cap Opportunities Fund. Mr. Sassine joined Fidelity as a high yield research analyst, covering the Telecommunications, Satellite, Technology, Defense and Aerospace, and Restaurant Industries and in 2001, joined the international group as a research analyst covering small and mid-cap international stocks. Mr. Sassine has been a member of the Henry B. Tippie College of Business, University of Iowa Board of Advisors from 2009 to 2018. Mr. Sassine earned a Bachelor of Arts degree at the University of Iowa in 1987 and an MBA from the Wharton School at the University of Pennsylvania in 1993. Our Board believes that Mr. Sassine's experience working with and investing in companies in the life sciences industry qualifies him to serve on the Board.

14

**Defendant Schroff**

45.    Defendant Schroff has served as the Company's CEO and as a Company director since February 2022. Prior to this, he was CSO from December 2021 until February 2022, and prior to this he was COO from April 2018 until December 2021. According to the 2021 Proxy Statement, Defendant Schroff beneficially owned 265,937 shares of Exicure common stock as of March 31, 2021. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $2.18, Defendant Schroff owned approximately $580,000 worth of Exicure stock.

46.    For 2021 Fiscal Year, Defendant Schroff's annual salary was $425,000. In connection with his transition to CSO in December 2021, he also received a retention award of $140,000, though his annual salary remained unchanged. During the 2021 Fiscal Year, he was also eligible for option awards, non-equity incentive plan compensation, and other compensation.

47.    The 2021 Proxy Statement said the following of Defendant Schroff:

*Matthias G. Schroff* has served as our Chief Operating Officer since April 2018. Dr. Schroff brings more than 15 years of senior leadership experience within global biopharmaceutical companies where he gained deep scientific and clinical experience in immuno-oncology, TLR9 biology and broad clinical program management. Prior to joining us, from September 2016 until December 31, 2017, Dr. Schroff served as the chief executive officer for VAXIMM AG, a Swiss/German biotech company. From January 2008 until December 31, 2015, Dr. Schroff was the chief executive officer of Mologen AG, a publicly traded German biopharmaceutical company. Dr. Schroff is the co-inventor on numerous patents in the field of immuno-oncology, RNAi and gene expression, including a TLR9 agonist in clinical development. He received his Ph.D. in molecular biology from Freie Universität Berlin and a degree in biochemistry from Leibniz Universität Hannover.

**Defendant Sulat**

48.    Defendant Sulat served as a Company director since December 2020. He also serves as Chairperson of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, Defendant Sulat beneficially

owned 4,820 shares of Exicure common stock as of March 31, 2021. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $2.18, Defendant Sulat owned approximately $11,000 worth of Exicure stock.

49.     According to the 2021 Proxy Statement, for the 2021 Fiscal Year, Defendant Sulat was entitled to a $40,000 cash retainer as a director, an additional $15,000 as Chairperson of the Audit Committee,[4] and additional compensation in the form of option awards.

50.     The 2021 Proxy Statement stated the following about Defendant Sulat:

*James Sulat* has served as a member of our Board of Directors since December 2020. He has also served as a member of the board of directors of AMAG Pharmaceuticals, Inc. from April 2014 to November 2020. From 2009 to 2013, Mr. Sulat served as Chief Executive Officer and Chief Financial Officer of Maxygen, Inc., a public biopharmaceutical company, and was a member of Maxygen's board of directors from 2003 to 2013. From 2005 until 2008, Mr. Sulat served in several roles of increasing responsibility at Memory Pharmaceuticals Corp., including as its President and Chief Executive Officer from 2005 to 2008, as its Chief Financial Officer during 2008, and as a member of its board of directors from 2005 to 2009. Mr. Sulat has served on the board of directors of Arch Therapeutics, Inc., a public medical device company, since August 2015. Mr. Sulat served as the chairman of the board of directors for Momenta Pharmaceuticals, Inc., a public biotechnology company, and as a member of its audit committee and its nominating and corporate governance committee from 2008 to July 2019. Since 2005, Mr. Sulat has served on the supervisory board of Intercell AG and, its successor company, Valneva SE, a public European biotechnology company, and currently serves on its audit committee and nominating and compensation committee. Mr. Sulat served on the board of directors of Diadexus, Inc., a public diagnostics company, from January 2015 to June 2016, and on the board of directors for Tolero Pharmaceuticals, Inc., a private biopharmaceutical company, from April 2015 to January 2017, until it was acquired by Sumitomo Dainippon Pharma Co., Ltd. Mr. Sulat received his B.S. in Administrative Sciences from Yale University. He received his M.B.A. and his M.S. in Health Services Administration from Stanford University. Our Board believes Mr. Sulat's experience in the pharmaceutical industry, expertise in corporate finance and public company board experience qualifies him to serve on the Board.

---

[4] Defendant Sulat served as Chairperson of the Audit Committee during the 2021 Fiscal Year, before also being made a member of the Nominating and Corporate Governance Committee in February 2022.

### Defendant Walbert

51.     Defendant Walbert served as a Company director from July 2019, and as Chairperson of the Board from April 2020, until his resignation in February 2022. During the 2021 Fiscal Year, Defendant Walbert served as a member of both the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, Defendant Walbert beneficially owned 46,398 shares of Exicure common stock as of March 31, 2021. Given that the price per share of the Company's common stock at the close of trading on March 31, 2021 was $2.18, Defendant Walbert owned approximately $101,000 worth of Exicure stock.

52.     According to the 2021 Proxy Statement, for the 2021 Fiscal Year, Defendant Walbert was entitled to a $40,000 cash retainer as a director, an additional $30,000 as Chairperson of the Board, an additional $7,500 as a member of the Audit Committee, an additional $5,000 as a member of the Nominating and Corporate Governance Committee, and additional compensation in the form of option awards.

53.     The 2021 Proxy Statement stated the following about Defendant Walbert:

*Timothy P. Walbert* has served as a member of our Board of Directors since July 2019 and Chairman of our Board of Directors since April 2020. Mr. Walbert is the president, chief executive officer and director of Horizon Therapeutics plc, a position he has held since June 2008, and has served as chairman of its board of directors since March 2010. From May 2007 to June 2009, Mr. Walbert served as president, chief executive officer and director of IDM Pharma, Inc., a public biopharmaceutical company that was acquired by Takeda America Holdings, Inc. in June 2009. Prior to that, Mr. Walbert served as executive vice president, commercial operations of NeoPharm, Inc., a public biopharmaceutical company. From 2001 to 2005, he served as divisional vice president and general manager, immunology, where he led the global development and launch of the multi-indication biologic HUMIRA and divisional vice president, global cardiovascular strategy at Abbott Laboratories, now AbbVie Inc. Mr. Walbert is a member of the board of directors of Aurinia Pharmaceuticals Inc. He previously served on the board of directors of Sucampo Pharmaceuticals, Inc. from October 2015 to March 2018, Raptor Pharmaceutical Corp. from 2010 to 2014, XOMA Corporation from

2011 to 2017, Egalet Corporation from 2016 to 2020 and Assertio Therapeutics, Inc. from 2019 to 2020. Mr. Walbert is co-chairman of the board of MATTER and serves on the board of directors of the Illinois Biotechnology Innovation Organization, the Biotechnology Innovation Organization and the Greater Chicago Arthritis Foundation. He is a member of the National Organization for Rare Disorders Advisory Board and serves on the Board of Trustees of Muhlenberg College. Mr. Walbert received his bachelor of arts degree in business from Muhlenberg College. Our Board believes that Mr. Walbert's experience in senior management and board positions with companies in the biotechnology and biopharmaceutical industries qualify him to serve on the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

54. By reason of their positions as officers, directors, and/or fiduciaries of Exicure and because of their ability to control the business and corporate affairs of Exicure, the Individual Defendants owed Exicure and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Exicure in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in the best interests of Exicure and its shareholders so as to benefit all shareholders equally.

55. Each director and officer of the Company owes to Exicure and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Exicure, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57. To discharge their duties, the officers and directors of Exicure were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith,

and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Exicure, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Exicure's Board at all relevant times.

59. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

60. To discharge their duties, the officers and directors of Exicure were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Exicure were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to Exicure's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Exicure conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Exicure and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Exicure's operations would comply with all applicable laws and Exicure's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial

information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61.     Each of the Individual Defendants further owed to Exicure and its shareholders the duty of loyalty requiring that each favor Exicure's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

62.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Exicure and were at all times acting within the course and scope of such agency.

63.     Because of their advisory, executive, managerial, and directorial positions with Exicure, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

64.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by Exicure.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

66.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross

mismanagement, waste of corporate assets, and violations of the Exchange Act.

67. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is or was a director of Exicure, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

69. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Exicure and was at all times acting within the course and scope of such agency.

## EXICURE'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Code of Conduct*

70. The Company's Code of Conduct states that Exicure "is committed to maintaining the highest standards of business conduct and ethics" and, to that end, that the Code of Conduct "reflects the business practices and principles of behavior that support the commitment to these high standards." Moreover, the Code of Conduct notes that it "applies to all Exicure employees,

officers and directors" each defined as a "Covered Person[.]"

71. Regarding "Compliance with Laws[,]" the Code of Conduct provides that:

We strive to comply not only with the letter but also with the spirit of the law. Our success depends upon everyone operating within legal guidelines and cooperating with local, national and international authorities. It is therefore essential that you understand the legal and regulatory requirements applicable to your business unit and area of responsibility. In particular, the research and development of pharmaceutical products is subject to a number of legal and regulatory requirements, including standards related to ethical research procedures and proper scientific conduct. We expect employees to comply with all such requirements. We may hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail below). If you have a question in the area of legal compliance, you should seek answers from your supervisor or the Compliance Officer.

Each Covered Person is expected to comply with the applicable laws in all countries where they travel, in which they operate and where we otherwise do business, including laws prohibiting bribery, corruption or the conduct of business with specified individuals, companies or countries. The fact that in some countries certain laws are not enforced, or that violation is not subject to public criticism, will not excuse noncompliance.

We also expect our employees, officers and directors to comply with U.S. laws, rules and regulations governing the conduct of business by its citizens and corporations outside the United States. Examples of those laws applicable to activities outside the United States include anti-boycott laws and prohibitions on business with, or restrictions on exports to, certain countries.

Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

72. The Code of Conduct states about "Conflict[s] of Interest[,]" in relevant part:

A "conflict of interest" occurs when an individual's personal interest may interfere in any way with the performance of his or her duties or the best interests of Exicure. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a personal obligation. We expect everyone to be free from influences that conflict with the best interests of Exicure. Even the appearance of a conflict of interest where none actually exists can be

23

damaging and should be avoided.

73.    The Code of Conduct section titled "Accuracy of Books and Records and Public

Reports" states, in relevant part:

> The integrity of our records and public disclosure depends on the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. All records and reports should be made in a timely manner, and, when applicable, should be properly authorized and maintained.

> Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the reports we file with the Securities and Exchange Commission . . . . These reports must provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. In connection with these obligations:

> • no one may knowingly take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

> • everyone must cooperate fully with our Finance Department and Legal Department, as well as our independent public accountants and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

> • no one should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

> Anyone who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor or the Compliance Officer, the Audit Committee or one of the other compliance resources described herein or in accordance with the provisions of the Company's Policy on Investigating Allegations of Suspected Improper Activities . . . .

74.    The Code of Conduct's "Scientific Integrity" section provides, in relevant part:

Our business is based on science and technology. Our business requires the use of processes, laboratory techniques, scientific methods, and other technology that demand attention to detail, safety, and high standards of professional care. Falsification, fabrication or plagiarism in connection with the proposal, performance or review of research, or in reporting its results, amounts to scientific misconduct when committed intentionally or with reckless disregard of accepted practices. No false, inaccurate, incomplete, or misleading data should ever be recorded or reported in connection with the conduct of the Company's business including your work for the Company.

75.     In a section on "Reporting Violations[,]" the Code of Conduct provides, in relevant part:

If you are aware of a suspected or actual violation of the Code by others or a violation or possible violation of federal or state law or regulation, including violations relating to accounting, internal accounting controls or auditing matters ("Compliance Concerns"), you have a responsibility to report it. You are expected to promptly provide your supervisor or the Compliance Officer with a specific description of the violation that you believe has occurred, including any information you have about the persons involved and the time of the violation.

76.     Regarding waivers of the Code of Conduct, the Code of Conduct states that:

Any waiver of this Code for executive officers (including, where required by applicable laws, our principal executive officer, principal financial officer, principal accounting officer or controller, and persons performing similar functions) or directors may be authorized only by our Board of Directors, or, to the extent permitted under applicable rules of the SEC or the Nasdaq Stock Market, a duly authorized committee of the Board of Directors. Any such waiver will be promptly disclosed to our stockholders, along with the reasons for such waiver, as required by applicable laws, rules and regulations and in a Current Report on Form 8-K filed with the SEC within five (5) days of such waiver.

Any waiver for other employees must be approved in advance by the Compliance Officer.

***Audit Committee Charter***

77.     Exicure's Charter of the Audit Committee of the Board of Directors (the "Audit Committee Charter") lists, among the Audit Committee's purposes, the obligations to "oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements" as well as to "review

25

any reports or disclosures required by applicable law and stock exchange listing requirements[.]"

78.     The Audit Committee Charter further provides that it is the Audit Committee's responsibility to:

> [C]onfer with management and the [independent] Auditors, as appropriate, regarding the scope, adequacy, and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, including any significant deficiencies, significant changes in internal controls and the adequacy and effectiveness of the Company's information and cyber security policies and the internal controls regarding information security, (ii) confer with management and the [independent] Auditors, as appropriate, regarding the responsibilities, budget and staff of the internal audit function (if any) and review of the appointment or replacement of the senior internal audit executive or manager and (iii) obtain reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.

79.     Moreover, the Audit Committee Charter provides that the Audit Committee shall "review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Business Conduct and Ethics[.]"

80.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight over the Individual Defendants' scheme to cause the Company to engage in the Deficient Controls Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Individual Defendants failed to comply with all relevant laws, rules and regulations; failed to avoid conflicts of interest; failed to maintain accurate Company books, records, and public disclosures; failed to maintain scientific integrity in the conduct of scientific research, failed to secure or disclose appropriate waivers of the Code of Conduct, and failed to report these known violations

of the Code of Conduct.

81.     In violation of the Audit Committee Charter, Defendants Garofalo, Sassine, Sulat, and Walbert—each of whom served on the Audit Committee during the Relevant Period— conducted little, if any, oversight over the Individual Defendants' scheme to cause the Company to engage in the Deficient Controls Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Audit Committee Charter, Defendants Garofalo, Sassine, Sulat, and Walbert failed to adequately oversee the Company's system of internal controls, failed to adequately review Company reports and disclosures, failed to adequately confer with management and the independent auditor regarding the Company's internal controls, and failed to provide adequate compliance oversight both with respect to the law and the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

82.     Exicure is a Delaware biotechnology company based in Illinois that develops therapeutics for certain illnesses based on spherical nucleic acid or SNA technology.

83.     During the Relevant Period, the Company was working on a product candidate called "XCUR-FXN" that was intended as a treatment for Friedreich's ataxia, a genetic neurological disorder that over time results in patients losing control over various muscle movements and typically ends in a patient's premature death.

84.     Exicure's preclinical XCUR-FXN program began in late 2020 and ran at least until the Company began investigating allegations of improprieties in November 2021. The program involved Company researchers including, *inter alia*, Group Lead of Neuroscience Dr. James

Corbett ("Dr. Corbett") and generated data about the safety and efficacy of XCUR-FXN by conducting tests on rodents. However, due to improprieties in the program, the data was being misreported. This misreported data would later be publicly disseminated by the Company.

**The Deficient Controls Misconduct**

85.     During the Relevant Period, the Individual Defendants caused the Company to fail to maintain adequate internal controls with respect to ensuring the proper collection, analysis, and reporting of the data generated by its studies. Moreover, the Individual Defendants caused the Company to fail to maintain adequate internal controls with respect to ensuring the accuracy of public disclosures, including investor presentations and SEC filings.

86.     Due to these failures, and as would later be revealed in press release issued by the Company on December 10, 2021, the Company's former Group Lead of Neuroscience, Dr. Corbett, "misreported raw data from certain research and development experiments related to XCUR-FXN." This began "in the autumn of 2020" and involved "Dr. Corbett misreport[ing] the results of at least three different experiments that were conducted through at least February 2021[.]"

87.     As the Company further admitted in the December 10, 2021 press release, this "misreported data was included in various public presentations and SEC filings from as early as January 7, 2021 through as late as August 12, 2021[.]"

88.     As the Company's directors and officers during the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by knowingly or recklessly causing the Company to engage in the Deficient Controls Misconduct, which caused the results of experiments involving XCUR-FXN to be misreported initially and then caused this misreported data to be disseminated to the public and the SEC, as outlined below.

89.    The Individual Defendants' knowledge can be inferred given that, as a clinical-stage biotechnology company, studies of XCUR-FXN directly involved Exicure's core operations. Throughout the Relevant Period and continuing to the present, the Company has yet to produce a commercially viable product. As the Company admitted in its 2020 10-K, Exicure "ha[s] not generated, and do[es] not expect to generate, any product revenue for the foreseeable future, and [Exicure] expect[s] to continue to incur significant operating losses for the foreseeable future due to the cost of research and development, preclinical studies, clinical trials, and the regulatory approval process for therapeutic candidates." At the time, XCUR-FXN was one of the Company's leading product candidates. Therefore, the accurate generation and dissemination of data related to XCUR-FXN constituted part of Exicure's core operations. As directors and officers at the Company, it is reasonable to infer that the Individual Defendants knew of this critical issue involving Exicure's core operations. That is, because of their positions of control and authority within the Company, the Individual Defendants must have known, or were highly reckless in not knowing, about the significant problems with the Company's internal controls over the proper collection, analysis, and reporting of data and the accuracy of the Company's public disclosures.

**False and Misleading Statements**

***January 7, 2021 R&D Day Presentation***

90.    On January 7, 2021, Exicure hosted a virtual "R&D Day" which heavily focused on XCUR-FXN. The presentation shown to attendees, and filed the same day with the SEC as an exhibit to a Form 8-K, included the following slides—slides 32 through 38—discussing Friedreich's ataxia and the Company's potential treatment for it:

## Friedreich's Ataxia (FA) – Progressive Neurological Disorder

- Degenerative, debilitating, life-shortening, neuromuscular disorder causing loss of coordination (ataxia) in arms and legs
- Monogenic disorder: FXN mutations result in reduced levels of frataxin
- Leads to progressive childhood disability and early death
  - Mean onset of symptoms between age 10 to 15[1]
  - Most patients wheelchair-bound within 2 decades of onset
  - Loss of coordination, neuropathy, hearing and vision loss, cardiomyopathy, diabetes
  - Most patients succumbing to disease in their 30s and 40s
- Most common inherited ataxia: ~13,500 cases across major reimbursable markets[2,3]
- No approved therapy for FA
- No therapies in late development which address the molecular cause of FA



1) Gene Review, Bidichandani SI, Delatycki MB. 2017.  2) OrphaNet, NIH, FARA.  3) US, EU28, Canada, Australia

exicure

32

## FA Results in Rapid Neurological Deterioration and Early Mortality

**Time to Wheelchair-Dependence[1]**




FIG. 1. Kaplan-Meier curve representing the disease duration before confinement to wheelchair for typical FA, LOFA, and vLOFA (P < 0.001)

**Early Mortality[2]**



Fig. 3. Distribution of deaths by age. The majority of deaths occurred between ages 16 and 45.

1) Lecocq et al., 2016; Rummey et al., 2020 with similar results  2) Tsou et al., 2011  3) LOFA = Late-Onset FA, n=44, mean onset at 29 years  4) vLOFA = Very Late-Onset FA, n=30, mean onset at 50 years  5) n=180, mean onset at 13 years

exicure

33

30

# Reduced Frataxin Expression Due To Expanded GAA Repeats Cause Neuronal Dysfunction in Friedreich's Ataxia



exicure

34

# Residual Frataxin Levels in FA Support Oligonucleotide Approach

## Frataxin Levels in Blood from FA Patients vs Controls



cFRDA = Classic, typical onset FA; LOFA = Late onset FA; pFRDA = heterozygous for repeat + point mutation
Whisker plot: Box outlines represent 95% CI, whiskers represent 99% CI, x = outliers beyond 99% CI
Source: Deutsch et al., 2014
1) Mean age at onset 11.3 years  2) Mean age at onset 36.7 years

## Conclusions

- Patients with FA have substantial residual frataxin

- Residual frataxin levels support Exicure's protein upregulation approach

- "Classic", typical onset[1] FA patients with frataxin levels of ~25% of healthy control in whole blood

- Late onset[2] FA patients with 45-60% of healthy control levels, below carrier levels of 65-70%

- Differential in disease onset based on frataxin levels strongly supports therapeutic rationale for increasing frataxin to slow disease progression

exicure

35

31

## Frataxin Levels Are Closely Tied to Disease Outcomes in FA



**GAA Repeat Number[1] Highly Correlated with Frataxin Levels[2]**

**GAA Repeat Number Highly Correlated with Disease Outcomes[3,4]**

- Conclusion from natural history data: **A novel therapeutic delivering even small increases in frataxin levels could drive meaningfully milder phenotypes**
- Natural genetic variation in GAA repeats in FA patients enables genotype-to-phenotype correlation
- Correlation virtually identical for FXN mRNA / protein

1) "GAA Repeat Number" refers to the number of GAA repeats in the allele with the smaller repeat throughout this presentation  2) Li et al., 2015  3) Lecocq et al., 2016  4) Tsou et al., 2011

ex|cure                                                                                                    36

## Modified Friedreich's Ataxia Rating Scale (mFARS) is a Validated, Approvable Endpoint for Measuring Impact on Disease Progression

- The "modified FARS" (mFARS) is the clinical rating scale used as the **primary outcome measure** in most contemporary clinical studies in Friedreich's Ataxia

- mFARS score (0-93 points, higher score = greater disability) is based on a **neurological examination** of bulbar, upper limb, lower limb, and upright stability/gait functions

- **mFARS** scores are **highly correlated** with scores of the predecessor version, the **FARS**, which has been used in past studies correlating frataxin levels to disease severity


**Bulbar Function** (speech, cough, facial/tongue atrophy) – 5 pts


**Upper Limb Coordination** (finger, arms) – 36 pts


**Lower Limb Coordination** (legs, feet) – 16 pts


**Upright Stability** (sitting, walking, etc.) – 36 pts

Sources: Rummey et al., Neurol Genet 2019; www.ataxia-study-group.net

ex|cure                                                                                                    37



1) Evans-Galea et al., 2012   2) Lynch et al., 2020   3) Illustrative to facilitate comparison; actual mFARS after 48 wks was higher due to progression, placebo-adjusted a 2.4-point decrease was observed.
4) Lynch et al., 2006; aggregate score of FARS (0-117 pts), Disability score (0-6 pts) and ADL (0-36 pts)

***March 11, 2021 Press Release***

91.    On March 11, 2021, the Company issued a press release announcing its financial results for the fourth quarter and full fiscal year ended December 31, 2020. The press release said of XCUR-FXN, in relevant part:

Corporate Progress

Key achievements during 2020 and recent developments include:

XCUR-FXN for Friedreich's ataxia

- Announced neurology pipeline expansion during virtual R&D day presentation in January 2021

- Initiated IND-enabling studies for XCUR-FXN in December 2020

92.    The statements in ¶¶ 90–91, were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was engaged Deficient Controls Misconduct; (2) there were improprieties in the testing of XCUR-FXN; (3) due to the Deficient Controls Misconduct and the improprieties in the testing

of XCUR-FXN, the Company misreported data about the efficacy of XCUR-FXN; and (4) therefore, XCUR-FXN was not as promising a product candidate as the Company represented and its development would need to be suspended. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *April 22, 2021 Proxy Statement*

93.     On April 22, 2021, the Company filed the 2021 Proxy Statement with the SEC. Among others, Defendants Giljohann, Cleland, Garofalo, Hau, Muralidhar, Sassine, Sulat, and Walbert solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act. The 2021 Proxy Statement contained material misstatements and omissions.

94.     The 2021 Proxy Statement asked Company shareholders to vote, *inter alia*, to: (1) elect Defendants Giljohann, Garofalo, and Sassine to the Board and (2) ratify, in an advisory capacity, the appointment of KPMG LLP as the Company's independent auditor for the 2021 Fiscal Year.

95.     The 2021 Proxy Statement described the Board's "Risk Oversight" function using the following list, that specifically included many risk oversight functions dealing directly with corporate strategy and product candidate development:

> The Board of Directors monitors and assesses key business risks directly through deliberations of the Board of Directors and also by way of delegation of certain risk oversight functions to be performed by committees of the Board of Directors. The Board of Directors regularly reviews and assesses, among other matters, the following important areas that present both opportunities and risk to the Company's business:
>
> - review and approval of the Company's annual operating and capital spending plan and review of management's updates as to the progress against the plan and any related risks and uncertainties;
>
> - ***periodic consideration of the balance of risk and opportunities presented by the Company's medium to long-term strategic plan and the potential***

*implications of success and failure in one or more of the Company's key drug development programs*;

- *regular consideration of the risks and uncertainties presented by alternative clinical development strategies*;

- *regular review of the progress and results of the Company's clinical development programs and early research efforts, including, without limitation, the strengths, weaknesses, opportunities and threats for these programs*;

- periodic review and oversight of any material outstanding litigation or threatened litigation;

- *review and approval of material collaboration partnerships for the further development and commercial exploitation of the Company's proprietary drug development programs and technologies*;

- *regular review and approval of the annual corporate goals and an assessment of the Company's level of achievement against these established goals*;

- *regular review of the Company's financial position relative to the risk and opportunities for the Company's business*;

- periodic review of the Company's intellectual property estate;

- review and assessment of succession planning and performance concerns for the Section 16 officers; and

- •periodic review of the Company's compensation programs.[5]

96.     The 2021 Proxy Statement continued by describing additional risk oversight functions exercised by the Board and its committees, stating:

> *The risk oversight function of the Board of Directors is also administered through various Board committees. The Audit Committee oversees the management of financial, accounting, internal controls, disclosure controls* and the engagement arrangement and regular oversight of the independent auditors. The Audit Committee also periodically reviews the Company's investment policy for its cash reserves and fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline.

---

[5] All emphasis in the quotations contained in this complaint is added, unless otherwise noted.

The Compensation Committee is responsible for the design and oversight of the Company's compensation programs. The Compensation Committee also regularly reviews and reports to the Board of Directors on succession planning for the executive officers and vice president level employees that report directly to the Chief Executive Officer.

The Nominating and Corporate Governance Committee periodically reviews the Company's corporate governance practices, including certain risks that those practices are intended to address. The Nominating and Corporate Governance Committee periodically reviews the composition of the Board of Directors to help ensure that a diversity of skills and experiences is represented by the members of the Board of Directors taking into account the stage of growth of the Company and its strategic direction.

In carrying out their risk oversight functions, the Board of Directors and its committees routinely request and review management updates, reports from the independent auditors and legal and regulatory advice from outside experts, as appropriate, to assist in discerning and managing important risks that may be faced by the Company. ***The Board of Directors is committed to continuing to ensure and evolve its risk oversight practices as appropriate given the stage of the Company's evolution as a drug development company and the fast-paced changes in the biopharmaceutical industry.*** Regarding ongoing COVID-19 pandemic, our management has been meeting frequently and will continue to address concerns of our employees and business, as well as updating and communicating with the Board regularly. The full Board has oversight and has been and will continue to be engaged concerning the monitoring and identification of risks to the Company, and actions we are taking to mitigate risks related to this pandemic.

97.    With respect to the Company's Code of Conduct, the 2021 Proxy Statement said:

We have adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. . . . ***If we make any substantive amendments to the Code of Business Conduct and Ethics or grants any waiver from a provision of the Code to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website.***

98.    The 2021 Proxy Statement also stated of the Company's compensation strategy

that: "***Our executive compensation program is based on a pay-for-performance philosophy***. We

designed our executive compensation program to align executive compensation with our business

objectives and the interests of our stockholders and to attract, retain and reward executives who

36

contribute to our success."

99.    Regarding "Annual Cash Incentive Bonuses[,]" the 2021 Proxy Statement said: "Annual cash incentive bonuses provide incentive award opportunities for the achievement of performance goals established by our Compensation Committee. The payment of ***awards under our 2020 annual cash incentive bonus program is subject to the attainment of specific performance goals relating to research and development*** and financing."

100.    The 2021 Proxy Statement was materially misleading and failed to disclose that: (1) contrary to the 2021 Proxy Statement's descriptions of the Board's and it committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing the Company to engage in the Deficient Controls Misconduct and to issue false and misleading statements; (2) the Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) the Company's "pay-for-performance" criteria being tied "to the attainment of specific performance goals relating to research and development" encouraged the Individual Defendants to engage in the Deficient Controls Misconduct and to issue false and misleading statements containing misreported data, in order to improperly increase their compensation by appearing to attain research and development goals.

101.    In addition, the 2021 Proxy Statement was materially misleading and failed to disclose that: (1) the Company was engaged in the Deficient Controls Misconduct; (2) there were improprieties in the testing of XCUR-FXN; (3) due to the Deficient Controls Misconduct and the improprieties in the testing of XCUR-FXN, the Company misreported data about the efficacy of XCUR-FXN; and (4) therefore, XCUR-FXN was not as promising a product candidate as the Company represented and its development would need to be suspended.

102.     Due to the false and misleading elements of the 2021 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) elect Defendants Giljohann, Garofalo, and Sassine to the Board, allowing them to continue breaching their fiduciary duties to the Company and (2) ratify, in an advisory capacity, the appointment of KPMG LLP as the Company's independent auditor for the 2021 Fiscal Year.

### *May 12, 2021 Press Release*

103.     On May 12, 2021, the Company issued a press release in which it announced its financial results for the quarter ended March 31, 2021. This press release discussed the supposed progress the Company had made in developing XCUR-FXN as follows:

Neurology – XCUR-FXN

- The Company hosted a virtual R&D Day in January 2021 to discuss progress within its neurology pipeline, which included an overview of the Company's XCUR-FXN path to clinical validation for the treatment of Friedreich's Ataxia (FA).

- During the first quarter of 2021, ***the Company continued to advance preclinical and IND-enabling studies of XCUR-FXN in FA and disclosed encouraging preclinical mouse data, demonstrating significant upregulation of XCUR-FXN components in the brain and spinal cord. The Company believes these data support the potential for XCUR-FXN as a disease-modifying treatment for the disease.***

- ***The Company is on track with prior guidance to submit an IND for XCUR-FXN in FA by year-end 2021 and expects to initiate a first-in-patient Phase 1b clinical trial of XCUR-FXN in FA in the first half of 2022.***

### *August 12, 2021 Press Release and Quarterly Report*

104.     On August 12, 2021, the Company issued a press release announcing its financial results for the quarter ended June 30, 2021. This press release discussed the supposed progress the Company had made in developing XCUR-FXN as follows:

XCUR-FXN – Friedreich's Ataxia

- The Company hosted a virtual R&D Day on July 15, 2021 to present new and ***previously unreleased preclinical data and discuss progress with XCUR-FXN***:

  o ***Observed 2-3x fold change in measurable Frataxin protein in the cerebellum and dorsal root ganglia*** (amongst other important brain and spinal regions) in Pook800J mouse model indicating potential for disease resolution;

  o ***Showed no adverse, test-related histopathological findings*** in repeat dose range finding rat study.

- ***The Company continues to expect to file for an IND for XCUR-FXN in FA by the end of 2021 and to dose the first human patient in the first half of 2022.***

105. That same day, August 12, 2021, the Company filed its quarterly report with the SEC for the quarter ended June 30, 2021 on Form 10-Q (the "2Q21 10-Q"). The 2Q21 10-Q which was signed by Defendant Bock and contained certifications signed by Defendants Giljohann and Bock—pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002—attesting to the accuracy of the financial statements contained in the 2Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

106. The 2Q21 10-Q stated of XCUR-FXN that:

We initiated IND-enabling studies for XCUR-FXN in late 2020. As discussed during our R&D day presentation in July 2021, in a completed non-GLP dose range finding study of XCUR-FXN in rats, designed to evaluate the safety profile of XCUR-FXN following intrathecal dosing, we have not observed any test article-related adverse findings and the highest dose level in this study (three repeat intrathecal (IT) injections of 782 µg each) was the no-observed-adverse-effect level (NOAEL) in this study. ***We expect to complete our GLP toxicology program and file an IND for XCUR-FXN in FA in the fourth quarter of 2021, and expect to initiate a first-in-patient Phase 1b clinical trial for XCUR-FXN in FA in the first half of 2022.*** We are collaborating closely with the Friedreich's Ataxia Research Alliance (FARA), the non-profit, charitable organization dedicated to accelerating research leading to treatments and a cure for FA, in the design and site selection of the Phase 1b clinical trial. ***The Phase 1b clinical trial is designed to demonstrate***

*safety and characterize pharmacokinetic properties of multiple ascending doses of XCUR-FXN in FA patients and inform Phase 2/3 dose selection. We are also planning to examine multiple biomarkers, including brain imaging and measurements of FXN levels in patient cerebrospinal fluid (CSF), to provide rapid read-out for target engagement and pharmacodynamic (PD) effects. We may include one or more exploratory endpoints, such as the modified Friedreich's Ataxia Rating Scale (mFARS), to prepare for a subsequent pivotal clinical trial.*

107.    The statements in ¶¶ 103–106, were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was engaged Deficient Controls Misconduct; (2) there were improprieties in the testing of XCUR-FXN; (3) due to the Deficient Controls Misconduct and the improprieties in the testing of XCUR-FXN, the Company misreported data about the efficacy of XCUR-FXN; and (4) therefore, XCUR-FXN was not as promising a product candidate as the Company represented and its development would need to be suspended. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

*November 15, 2021 Form 12b-25*

108.    On November 15, 2021, the truth began emerging when the Company filed Form 12b-25 with the SEC, informing the SEC that the Company's quarterly report for the quarter ended September 30, 2021 would not be timely filed. The Form 12b-25 attributed this failure to an ongoing Company investigation into "*a claim made by a former Company senior researcher regarding alleged improprieties that researcher claims to have committed with respect to the Company's XCUR-FXN preclinical program* for the treatment of Friedreich's ataxia."

109. On this news, the price of the Company's common stock fell from $1.070 per share at the close of trading on November 15, 2021, to close November 16, 2021 at $0.777 per share. This constituted a decline of $0.293 or over 27.3%.

110. While this statement did begin to alert the investing public that something was amiss at Exicure, the statement identified in ¶ 108 was still materially false and misleading and failed to disclose material facts necessary to make the statement made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was engaged Deficient Controls Misconduct; (2) there were improprieties in the testing of XCUR-FXN; (3) due to the Deficient Controls Misconduct and the improprieties in the testing of XCUR-FXN, the Company misreported data about the efficacy of XCUR-FXN; and (4) therefore, XCUR-FXN was not as promising a product candidate as the Company represented and its development would need to be suspended.

### November 19, 2021 Press Release

111. The truth continued emerging on November 19, 2021, when the Company issued a press release announcing its financial results for the quarter ended September 30, 2021. This press release revealed that Exicure's Audit Committee had retained outside counsel to conduct an internal investigation into the claim of impropriety in the testing of XCUR-FXN made by a former Company senior researcher. The press release stated, in relevant part:

> Exicure, Inc.® (NASDAQ: XCUR), a pioneer in gene regulatory and immunotherapeutic drugs utilizing spherical nucleic acid (SNA™) technology, today reported financial results for the quarter ended September 30, 2021 and provided an update on corporate progress.
>
> "I would first like to recognize the amazing work from the high-quality team members at Exicure as we continue to invest into driving value from our SNA platform technology, most notably being recognized in the third quarter through the consummation of another strategic partnership which brought in additional non-dilutive capital," said Exicure CEO Dr. David Giljohann. "It is important to note

our SNA platform is grounded in 15 years of intensive and rigorous scientific development across industry and academia. ***Although a recent claim of improprieties from one researcher, specifically related to our FXN program, are concerning, we are highly confident in our platform technology which delivers DNA and RNA into cells and tissues more effectively. I remain proud of the team members at Exicure who continue to work hard to bring new medicines to patients in need.***"

Corporate Updates

***As previously reported, on November 9, 2021, the Audit Committee of the Board of Directors of the Company was notified of a claim made by a former Company senior researcher regarding alleged improprieties that researcher claims to have committed with respect to the Company's XCUR-FXN preclinical program for the treatment of Friedreich's ataxia. The Audit Committee has retained external counsel to conduct an internal investigation of the claim. The Company is currently unable to predict the timing or outcome of the investigation.***

Pipeline Highlights & Updates

Neurology

\*            \*            \*

XCUR-FXN–Friedreich's Ataxia

- ***Exicure remains committed to maintaining its development plans*** and to pursuing its business strategy in the best interests of its stockholders as well as the patients it looks to serve; ***however***, it acknowledges that, at this point in time, ***it is unable to determine the potential impact of the asserted claim on its research and development activities or the timing of completion of its current research and development of its XCUR-FXN preclinical program for the treatment of FA, as the investigation of the asserted claim remains ongoing.***

112.    On this news, the price of the Company's common stock fell from $0.658 per share at the close of trading on November 18, 2021, to close November 19, 2021 at $0.460 per share. This constituted a decline of $0.198 or over 30%.

113.    While this statement further alerted the public that something was amiss at Exicure, the statement identified in ¶ 111 was still materially false and misleading and failed to disclose material facts necessary to make the statement made not false and misleading. Specifically, the

Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was engaged Deficient Controls Misconduct; (2) there were improprieties in the testing of XCUR-FXN; (3) due to the Deficient Controls Misconduct and the improprieties in the testing of XCUR-FXN, the Company misreported data about the efficacy of XCUR-FXN; and (4) therefore, XCUR-FXN was not as promising a product candidate as the Company represented and its development would need to be suspended.

### **The Truth Fully Emerges**

114.    The truth fully emerged on December 10, 2021, after the market had closed, when the Company issued a press release titled "Exicure, Inc. Announces Results of Internal Investigation and Implementation of Strategic Measures to Reduce Cash Burn and Prioritize Pipeline Focus[.]" The Company announced the results of the Audit Committee's investigation, including that there were improprieties in the testing of XCUR-FXN and that the Company had publicly misreported data, as follows:

> Exicure, Inc.® (NASDAQ: XCUR) announced the results of its previously disclosed independent internal investigation and a number of strategic actions aimed to reduce cash spend and prioritize the Company's therapeutic pipeline.
>
> ***The Audit Committee of the Board of Directors of the Company (the "Audit Committee") today announced the findings of the internal investigation*** initiated and overseen by the Audit Committee and conducted by outside counsel in connection with ***alleged improprieties that Grant Corbett, Ph.D., the Company's former Group Lead of Neuroscience, claimed to have committed*** with respect to the Company's XCUR-FXN preclinical program.
>
> The results of the investigation are summarized below.
>
> - ***Beginning in the autumn of 2020, Dr. Corbett misreported raw data from certain research and development experiments related to XCUR-FXN;***
> - ***Dr. Corbett misreported the results of at least three different experiments that were conducted through at least February 2021;***
> - The misreported data related solely to efficacy rather than safety of XCUR-FXN;

- ***The misreported data was included in various public presentations and SEC filings from as early as January 7, 2021 through as late as August 12, 2021;***
- Dr. Corbett acted alone in misreporting the data, without the assistance or knowledge of anyone else at the Company, including Company management and other research and development employees and did not inform anyone at the Company of his actions until his resignation in November 2021;
- Company management reasonably relied on Dr. Corbett's analysis when making public statements that included Dr. Corbett's misreported data; and
- No other Company program was impacted by Dr. Corbett's misreporting of the XCUR-FXN data.

115.    The press release continued by noting that the Company would be taking remedial measures in light of the investigation's findings, including downsizing its workforce, suspending development of XCUR-FXN, and restructuring its executive team. The press release stated, in relevant part:

> After a review of the Audit Committee's findings from the investigation and in combination with a previously initiated strategic review of the Company's business plans and objectives and its existing cash resources, the Company's Board of Directors has implemented the following approved plan:
>
> - ***A staggered workforce reduction of approximately 50%, expected to be completed by January 2022;***
> - Discontinuation of further enrollment and the ethical wind down of the Company's ongoing Phase 1b/2 cavrotolimod (AST-008) clinical trial in patients with solid tumors
> - ***Indefinite suspension of further development of the Company's XCUR-FXN program for the treatment of Friedreich's ataxia***
> - Restructuring and realignment of the Company's executive team as follows, effective today:
>   - ***Brian C. Bock, the Company's former Chief Financial Officer, has been appointed as the Company's President and Chief Executive Officer, replacing David Giljohann,*** and was appointed as a member of the Board.
>   - ***Dr. David Giljohann, the Company's former Chief Executive Officer, has resigned from the Board*** and will serve as Chief Technology Officer through January 31, 2022.
>   - ***Matthias Schroff, the Company's former Chief Operating Officer, has assumed the new role of Chief Scientific Officer;***

- o ***Sarah Longoria***, the Company's former Vice President of Human Resources has been ***appointed*** as the Company's Chief Human Resources Officer and ***Chief Compliance Officer***; and
- o ***Douglas Feltner, M.D., the Company's Chief Medical Officer,*** has agreed to assist in the wind down of the cavrotolimod and XCUR-FXN programs and ***will depart the Company on January 31, 2022.***

116.    Thus, despite the Audit Committee finding that "Company management reasonably relied on Dr. Corbett's analysis when making public statements," in the very same press release the Company announced that following the investigation that the CEO was resigning and being replaced by the CFO, that the Chief Medical Officer was also departing the Company, that the COO's role was being modified, and that the Company would now have a Chief Compliance Officer moving forward.

117.    Moreover, by purportedly exonerating management, the Audit Committee, by implication, provided itself and the rest of the Board with cover for their failures to exercise adequate oversight over management and for their additional failures to remedy the Deficient Controls Misconduct, to prevent the dissemination of false and misleading statements, and to fail to correct those same false and misleading statements despite their knowledge. That is, the Audit Committee was interested in finding that management had behaved reasonably, because such a conclusion would support an inference that the Audit Committee, and the rest of the Board, had also acted reasonably despite their numerous breaches of fiduciary duties and other violations of law, as alleged herein.

118.    The press release also announced certain financial and strategic results that stemmed from the investigation's findings, as follows:

Exicure expects to realize approximately $6.0 million in employee related cost savings in 2022, plus additional costs relating to the elimination of the cavrotolimod and XCUR-FXN programs. ***The Company estimates that it will incur total expenses relating to the restructuring of approximately $1.2 million, consisting***

45

*of severance and termination-related costs and expects to record a significant portion of these charges in the fourth quarter of 2021.*

The Company intends to align its research and development resources to support (i) the development of its preclinical program targeting SCN9A for neuropathic pain, (ii) the continued advancement of its partnered programs with Ipsen Biopharm Limited to develop SNA-based treatments in neuroscience targeting Huntington's disease and Angelman syndrome, (iii) its continued advancement of its partnered program with AbbVie to develop SNA-based treatments for hair loss disorders, as well as (iv) the continued research and development of other undisclosed therapeutic product candidates.

The Company also announced a prepayment of $10.0 million of its outstanding loans under its senior secured term loan debt facility with MidCap Financial Trust, as agent, and Silicon Valley Bank (SVB), leaving a remaining outstanding balance of $7.5 million, which will remain subject to the existing terms under the loan facility.

119.    Finally, the press release contained the following statements from Defendants Bock

and Walbert:

"This has been a difficult time for all of our stakeholders and Exicure employees. I want to first thank the employees impacted by our workforce reduction for their significant contributions in pursuing treatments for patients with unmet medical needs and wish them success in their future endeavors. Although *this unfortunate event will have residual effects*, I strongly believe there is great value to be unlocked at Exicure with our proprietary Spherical Nucleic Acid (SNA) technology, and I look forward to advancing our promising programs in pain and other neuroscience diseases and continuing to closely work with our partners to develop innovative therapies for the treatment of genetic disorders," stated Brian Bock, President and Chief Executive Officer, Exicure.

"On behalf of the Board of Directors, I want to thank David Giljohann for his discoveries and contributions to the development of our proprietary SNA architecture, commitment in building Exicure from the ground up and leadership during his time at the Company," said Tim Walbert, Chairman of the Board, Exicure. "We look forward to working closely with Brian Bock as he assumes leadership of the Company. The Board believes Brian's disciplined approach as well as his financial and investment banking background make him well suited to develop the new strategic path for Exicure and navigate the Company through the next phase in the Company's evolution."

120.    On this news, the price of the Company's common stock fell from $0.455 per share at the close of trading on Friday, December 10, 2021, to close Monday, December 13, 2021—the next trading day—at $0.270 per share. This constituted a decline of $0.185 or over 40%.

***Subsequent Developments***

121.    On February 4, 2022, the Company announced further organizational changes in a press release. This included Defendant Bock resigning as CEO and as a director, Defendant Schroff being appointed CEO and a director, and Defendants Hau, Sassine, and Walbert resigning from the Board. The press release stated, in relevant part:

> Exicure, Inc.® (NASDAQ: XCUR), a pioneer in gene regulatory drugs utilizing spherical nucleic acid (SNA™) technology, ***today announced that Brian C. Bock has submitted his resignation as President and Chief Executive Officer and a member of the Board of Directors of Exicure*** to pursue a new opportunity. Effective today, Mr. Bock will transition into an advisory role with the Company and will serve as Special Advisor to the Chief Executive Officer to assist during a transition period.

> ***The Board has appointed Matthias Schroff, Ph.D., Exicure's current Chief Scientific Officer, to succeed Mr. Bock effective February 4, 2022. Additionally, Dr. Schroff was appointed as a member of the Company's Board of Directors to fill the vacancy resulting from Mr. Bock's resignation from the Board.***

> The Company also announced today that ***Andrew (Andy) Sassine, a Board member and a member of the Audit Committee, has tendered his resignation to step down from the Board as of February 3, 2022. Timothy P. Walbert, who currently serves as Exicure's Chair of the Board, and Bosun Hau, a Board member and Compensation Committee Chair, have each tendered their resignations to step down from the Board, effective February 4, 2022.***

> The Board has appointed Betsy Garofalo, M.D. to succeed Mr. Walbert as Chair of the Board and to serve on the Compensation Committee of the Board of Directors to fill the vacancy on the Compensation Committee resulting from Mr. Hau's resignation from the Board. The Board also appointed Jeffrey L. Cleland, Ph.D. to serve as the Chair of the Compensation Committee following Mr. Hau's resignation, and appointed Bali Muralidhar, M.D., Ph.D. to serve as a member of the Audit Committee following Mr. Sassine's resignation.

> "On behalf of the Board and the Exicure organization, I would like to thank Brian, Tim, Bosun and Andy for all of their contributions to the Company and wish all of

them the best in the future," said Dr. Garofalo. "Our leadership team has made good progress since the unfortunate events of the fourth quarter of 2021 in stabilizing the business, and I look forward to collaborating with Dr. Schroff to advance our promising proprietary and partnered therapeutic programs and continuing to focus on beneficial business development opportunities with the goal of increasing value for our shareholders."

***"We believe these changes will act to right size the number of board members to the state of our current operations, optimize our leadership to execute on our science driven programs and further reduce overall costs," said Dr. Schroff.*** "With our versatile SNA platform and promising SCN9A non-opioid pain program, we have a solid foundation to build on. In addition, we are strengthened by our valuable partnerships and have received reassurances in 2022 of continuing commitments by both Ipsen Biopharm Limited and AbbVie to moving forward our joint development plans and look forward to progressing these programs. We will also continue to proactively seek new partnerships in the field of nucleic acid therapies and expect to release important development data as we advance our SCN9A program through 2022. With our high-caliber team of individuals, I am highly confident in our capabilities to overcome the challenges in the field of nucleic acid therapies and am very excited about the future prospects of Exicure."

## DAMAGES TO EXICURE

122.    As a direct and proximate result of the Individual Defendants' conduct, Exicure has lost and expended, and will lose and expend, many millions of dollars.

123.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and Defendants Giljohann and Bock, any internal investigations—including the Audit Committee investigation into the misconduct at issue—and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

124.    Such expenditures also include, but are not limited to, the costs associated with remedying the Deficient Controls Misconduct, including any costs associated with implementing adequate controls over the collection, analysis, and reporting of data and the accuracy of public disclosures.

125.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including

the "approximately $1.2 million, consisting of severance and termination-related costs" that the Company paid in connection with its management restructure following the Audit Committee investigation's findings.

126. As a direct and proximate result of the Individual Defendants' conduct, Exicure has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

127. Plaintiff brings this action derivatively and for the benefit of Exicure to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Exicure, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act, as well as the aiding and abetting thereof.

128. Exicure is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

129. Plaintiff is, and has continuously been at all relevant times, a shareholder of Exicure. Plaintiff will adequately and fairly represent the interests of Exicure in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

130. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

131.    A pre-suit demand on the Board of Exicure is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants Schroff, Garofalo, Cleland, Muralidhar, and Sulat (together, the "Directors"). Plaintiff needs only to allege demand futility as to three of these five Directors.

132.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Deficient Controls Misconduct and to make false and misleading statements and omissions of material fact, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

133.    In complete abdication of their fiduciary duties, the Directors knowingly or recklessly participated in causing the Company to engage in the Deficient Controls Misconduct and to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

134.    Additional reasons that demand on Defendant Schroff is futile follow. Defendant Schroff has served as Exicure's CEO and as a Company director since February 2022. Prior to this, he was Exicure's CSO from December 2021 until February 2022, and prior to this he was Exicure's COO from April 2018 until December 2021. Thus, as a long standing Company employee, he is a non-independent director. The Company provides Defendant Schroff with his principal occupation, and he receives handsome compensation as described above. As the Company's COO during the Relevant Period, Defendant Schroff conducted little, if any, oversight

of the scheme to cause the Company to engage in the Deficient Controls Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Schroff breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on Defendant Garofalo is futile follow. Defendant Garofalo has served as a Company director since March 2021 and as Chairperson of the Board since February 2022. She also serves as a member of both the Audit Committee and the Compensation Committee. Defendant Garofalo has received and continues to receive meaningful compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in the Deficient Controls Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Garofalo solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to her reelection to the Board and the reelection of Defendants Giljohann and Sassine, allowing all three of them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Garofalo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Cleland is futile follow. Defendant Cleland has served as a Company director since July 2019. He also serves as Chairperson of the Compensation Committee and as a member of the Nominating and Corporate Governance

Committee. Defendant Cleland has received and continues to receive meaningful compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in the Deficient Controls Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Cleland solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to the reelection of Defendants Garofalo, Giljohann, and Sassine, allowing all three of them to continue breaching their fiduciary duties to the Company. For these reasons, too, Defendant Cleland breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Muralidhar is futile follow. Defendant Muralidhar has served as a Company director since August 2019. He also serves as Chairperson of the Nominating and Corporate Governance Committee and as a member of both the Audit Committee and the Compensation Committee. Defendant Muralidhar has received and continues to receive meaningful compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in the Deficient Controls Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Muralidhar solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to the reelection of Defendants Garofalo, Giljohann, and Sassine, allowing all three of them to continue breaching their fiduciary duties to the Company. For these

reasons, too, Defendant Muralidhar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Sulat is futile follow. Defendant Sulat has served as a Company director since December 2020. He also serves as Chairperson of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Sulat has received and continues to receive meaningful compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in the Deficient Controls Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sulat solicited the 2021 Proxy Statement, the false and misleading elements of which contributed to the reelection of Defendants Garofalo, Giljohann, and Sassine, allowing all three of them to continue breaching their fiduciary duties to the Company. For these reasons, too, Defendant Sulat breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.    Additional reasons that demand on the Board is futile follow.

140.    The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Muralidhar and Hau worked together as Partners at MVM Partners LLP—a healthcare investment firm—from November 2012, when Defendant Muralidhar joined, until October 2015, when Defendant Hau

left. In addition, Defendants Sulat and Muralidhar served together on the supervisory board of a publicly-traded European biotechnology company, Valneva SE, from June 2017 until December 2019—the duration of Defendant Muralidhar's tenure there. These conflicts of interest precluded Defendants Sulat and Muralidhar from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, Defendants Sulat and Muralidhar face a substantial likelihood of liability and demand is futile as to them.

141.    Defendants Sulat, as Chairperson, and Garofalo (the "Audit Committee Directors"), served as members of the Audit Committee during the Relevant Period, alongside Defendants Sassine and Walbert. In violation of the Audit Committee Charter, the Audit Committee Directors, Defendant Sassine, and Defendant Walbert conducted little, if any, oversight over the Individual Defendants' scheme to cause the Company to engage in the Deficient Controls Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Audit Committee Charter, the Audit Committee Directors, Defendant Sassine, and Defendant Walbert failed to adequately oversee the Company's system of internal controls, failed to adequately review Company reports and disclosures, failed to adequately confer with management and the independent auditor regarding the Company's internal controls, and failed to provide adequate compliance oversight both with respect to the law and the Code of Conduct. Due to these violations of the Audit Committee Charter, the Audit Committee Directors cannot independently and disinterestedly consider a demand against themselves and Defendants Sassine and Walbert. Thus, the Audit Committee Directors breached their fiduciary duties, are not independent or disinterested, and demand is excused as to them.

142.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight over the Individual Defendants' scheme to cause the Company to engage in the Deficient Controls Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Directors failed to comply with all relevant laws, rules, and regulations; failed to avoid conflicts of interest; failed to maintain accurate Company books, records, and public disclosures; failed to maintain scientific integrity in the conduct of scientific research, failed to secure or disclose appropriate waivers of the Code of Conduct, and failed to report these known violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

143.    In addition, given their extensive and relevant education and experience in the healthcare industry, as detailed herein, each of the Directors knew or was reckless in not knowing of the issues with the XCUR-FXN preclinical program and the data it generated. Defendant Garofalo earned her M.D. from the Indiana University School of Medicine and has years of experience in the healthcare industry, having started her career at Parke-Davis/Pfizer. She is currently a Principal at EAG Pharma Consulting LLC. In addition, she currently serves on the board of numerous other nonprofit and commercial healthcare entities, including, for example, the Institute for Advanced Clinical Trials in Children and Acadia Pharmaceuticals, Inc. Defendant Schroff earned his Ph.D. in molecular biology from Freie Universität Berlin and has also spent years in the healthcare industry. Prior to joining the Company, Defendant Schroff was CEO of VAXIMM AG, a European biotechnology company, and prior to that he was CEO of Mologen AG, a European biopharmaceutical company. Moreover, he is a co-inventor on numerous

healthcare-related patents. Defendant Cleland earned his Ph.D. in chemical engineering from the Massachusetts Institute of Technology and is currently the CEO and Chairman of Ashvattha Therapeutics, Inc., a healthcare company. He has served in high-level executive positions at healthcare companies dating back to at least 2008, when he cofounded and served as CEO of Versartis, Inc. Moreover, he has previously worked as an adjunct professor of chemical engineering at University of the Pacific, University of Kansas, and University of Colorado. Defendant Muralidhar earned his M.D. from the University of Oxford and his Ph.D. in translational cancer research from the MRC Cancer Cell Unit, University of Cambridge. He was worked at numerous healthcare investment firms dating back to 2011 and has served on the boards of other healthcare companies. Finally, Defendant Sulat earned an M.S. in health services administration from Stanford University and has served in executive and directorial capacities at numerous healthcare companies dating back to at least 2005. He currently also serves as a director at a medical device company, Arch Therapeutics, Inc.  However, despite their specialized knowledge and experience, the Directors failed to remedy the Deficient Controls Misconduct or to correct the materially false and misleading statements and omissions issued throughout the Relevant Period. As a result, they face a substantial likelihood of liability. Thus, each of the Directors further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

144.    Exicure has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Exicure any part of the damages Exicure suffered and will continue to suffer thereby. Thus, any demand upon the Directors now would be futile.

145.    The Individual Defendants' conduct described herein and summarized above could

not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

146.    The acts complained of herein constitute violations of fiduciary duties owed by Exicure officers and directors, and these acts are incapable of ratification.

147.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Exicure. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or the other Individual Defendants, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

148.    If there is no directors' and officers' liability insurance, then the Directors will not cause Exicure to sue the Individual Defendants named herein, since, if they did, they would face a

large uninsured individual liability. Accordingly, demand is futile in that event, as well.

149.    Thus, for the reasons set forth above, all of the Directors, and if not all of them at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Defendants Giljohann, Cleland, Garofalo, Hau, Muralidhar, Sassine, Sulat, and Walbert for Violations of Section 14(a) of the Exchange Act**

150.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

152.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9

153.    Under the direction and watch of Defendants Giljohann, Cleland, Garofalo, Hau, Muralidhar, Sassine, Sulat, and Walbert, the 2021 Proxy Statement failed to disclose, *inter alia*, that: (1) contrary to the 2021 Proxy Statement's descriptions of the Board's and it committees'

risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing the Company to engage in the Deficient Controls Misconduct and to issue false and misleading statements; (2) the Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) the Company's "pay-for-performance" criteria being tied "to the attainment of specific performance goals relating to research and development" encouraged the Individual Defendants to engage in the Deficient Controls Misconduct and to issue false and misleading statements containing misreported data, in order to improperly increase their compensation by appearing to attain research and development goals.

154. Under the direction and watch of Defendants Giljohann, Cleland, Garofalo, Hau, Muralidhar, Sassine, Sulat, and Walbert, the 2021 Proxy Statement further failed to disclose, *inter alia*, that: (1) the Company was engaged in the Deficient Controls Misconduct; (2) there were improprieties in the testing of XCUR-FXN; (3) due to the Deficient Controls Misconduct and the improprieties in the testing of XCUR-FXN, the Company misreported data about the efficacy of XCUR-FXN; and (4) therefore, XCUR-FXN was not as promising a product candidate as the Company represented and its development would need to be suspended.

155. In the exercise of reasonable care, Defendants Giljohann, Cleland, Garofalo, Hau, Muralidhar, Sassine, Sulat, and Walbert should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including whether to reelect Defendants Garofalo, Giljohann, and Sassine to the Board and whether to ratify the appointment of KPMG LLP as independent auditor for the 2021 Fiscal

Year.

156.    The false and misleading elements of the 2021 Proxy Statement led to shareholders reelecting Defendants Garofalo, Giljohann, and Sassine, allowing them to continue breaching their fiduciary duties to the Company, and ratifying the appointment of KPMG LLP as independent auditor for the 2021 Fiscal Year.

157.    The Company was damaged as a result of the Defendants Giljohann, Cleland, Garofalo, Hau, Muralidhar, Sassine, Sulat, and Walbert's material misrepresentations and omissions in the 2021 Proxy Statement.

158.    Plaintiff on behalf of Exicure has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Exicure's business and affairs.

161.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

162.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Exicure.

163.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in the Deficient Controls Misconduct.

164.    During the Relevant Period, the Individual Defendants also breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Deficient Controls Misconduct; (2) there were improprieties in the testing of XCUR-FXN; (3) due to the Deficient Controls Misconduct and the improprieties in the testing of XCUR-FXN, the Company misreported data about the efficacy of XCUR-FXN; and (4) therefore, XCUR-FXN was not as promising a product candidate as the Company represented and its development would need to be suspended. As a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

165.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

166.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, including causing the Company to engage in the Deficient Controls Misconduct and to issue false and misleading statements. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and

for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

167.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

168.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Exicure has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

169.    Plaintiff on behalf of Exicure has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

170.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

171.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Exicure.

172.    The Individual Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Exicure that was tied to the performance or artificially inflated valuation of Exicure, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes $1.2 million in costs associated with the management restructure following the truth emerging on December 10, 2021.

173.    Plaintiff, as a shareholder and a representative of Exicure, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and

other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

174.    Plaintiff on behalf of Exicure has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

175.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

177.    As a direct and proximate result of the Individual Defendants' abuse of control, Exicure has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Exicure has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

178.    Plaintiff on behalf of Exicure has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

179.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

181.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Exicure has sustained and will continue to sustain significant damages.

182.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

183.    Plaintiff on behalf of Exicure has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

184.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Exicure to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

186.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

187.    Plaintiff on behalf of Exicure has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Giljohann and Bock for Contribution Under Sections 10(b) and 21D of the Exchange Act

188.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189.     Exicure, along with Defendants Giljohann and Bock, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Giljohann's and Bock's willful and/or reckless violations of their obligations as officers and/or a director of the Company.

190.     Defendants Giljohann and Bock, because of their positions of control and authority as officers and/or a director of Exicure, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Exicure, including the wrongful acts complained of herein and in the Securities Class Action.

191.     Accordingly, Defendants Giljohann and Bock are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

192.     As such, Exicure is entitled to receive all appropriate contribution or indemnification from Defendants Giljohann and Bock.

**PRAYER FOR RELIEF**

193.     FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Exicure, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Exicure;

65

(c)     Determining and awarding to Exicure the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Exicure and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Exicure and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Exicure to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Exicure restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: March 1, 2022                    Respectfully submitted,

                                        */s/ Benjamin Wedeking*
                                        Benjamin Wedeking (Ill. SBN 6334647)
                                        Timothy Brown
                                        **THE BROWN LAW FIRM, P.C.**
                                        767 Third Avenue, Suite 2501
                                        New York, NY 10017
                                        Tel: (516) 922-5427
                                        Fax: (516) 344-6204
                                        bwedeking@thebrownlawfirm.net
                                        tbrown@thebrownlawfirm.net

                                        Phillip Kim
                                        **THE ROSEN LAW FIRM, P.A.**
                                        275 Madison Avenue, 40th Floor
                                        New York, NY 10016
                                        Tel: (212) 686-1060
                                        Fax: (212) 202-3827
                                        pkim@rosenlegal.com

                                        *Counsel for Plaintiff*

## **VERIFICATION**

I, Kapil Puri, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this ___ day of_____, 2022.

3/1/2022

DocuSigned by:

AE2FF6073B9340E...